IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MICHAEL J. HELLER,

    Petitioner,                    No. 2:05-cv-2518 LKK KJN P

   vs.

K. POWERS-MENDOZA,

    Respondent.             FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a 2005 decision of California Governor Arnold Schwarzenegger reversing a decision by the California Board of Parole Hearings ("Board") to grant petitioner a parole date. Petitioner claims that the procedures used to find him unsuitable for parole violated due process, and that the reversal was based on both an erroneous understanding of petitioner's conviction and on political considerations. Petitioner also claims that the governor's decision to reverse the Board's decision violates the Ex Post Facto Clause, alleging that the law authorizing the governor's review was passed after petitioner committed his crime and operates to lengthen his sentence. After carefully considering the record, the undersigned recommends that the petition be granted as to the due process claim.

II. Factual and Procedural Background.

On June 3, 1983, petitioner was sentenced to nineteen years to life in state prison following his conviction on charges of second degree murder with use of a firearm and possession of cocaine and marijuana. (Pet. at 1.) Petitioner, intoxicated by alcohol and drugs, shot the victim with a .25 pistol in anger because he believed the victim had sold him diluted cocaine. (Traverse at 2.) Petitioner was twenty-six years old at the time of his commitment offense. (Id., Ex. A at 2.)

This action is proceeding on the instant petition filed on December 12, 2005. (Dkt. No. 1.) On May 24, 2007, respondent filed an answer. (Dkt. No. 33.) On August 6, 2007, petitioner filed a traverse. (Dkt. No. 36.) Petitioner's minimum eligible parole date on his life term occurred on May 23, 1994. (Pet., Ex. F at 1.)

On January 31, 2005, petitioner appeared before the Board for his ninth subsequent parole consideration hearing.[1] (Pet., Ex. A.) At the conclusion of the hearing, the Board found petitioner suitable for parole. The Board's determination that petitioner "is not a danger to society or a threat to public safety" (id. at 55), was based on several findings:

1. Petitioner "has no juvenile record of assaulting others."

2. In prison, petitioner "has enhanced his ability to function within the law upon release through participation in education programs, self-help, therapy, vocational programs and institutional job assignments, including, but in no way limited to, Alternatives to Violence; Life Skills Group; one-on-one therapy; alcohol and drug treatment, Pathfinders self-help class; alcohol and drug treatment, Cognitive Skills; Anger Management; Breaking Barriers; Cage Your Rage; CALM." (Id.) Petitioner "has been involved in AA and NA 12-Step programs"; and "received an A.A. and a Bachelor's degree while in custody." (Id.)

---

[1] It appears petitioner was again found suitable for parole by the Board in 2009, but the Governor, for the second time, reversed that decision. Heller v. Hartley, 1:10-cv-1227 SKO (E.D. Cal. 2010) (Fresno Division). A court may take judicial notice of court records. See MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986).

3. In prison, petitioner "worked for the PIA furniture factory and PIA bakery." (Id. at 56.) He was "an AIDS and HIV instructor through the Red Cross." (Id.) "Job assignments include administrative clerk, program porter, hobby shop, recreation yard and culinary." (Id.) He's completed vocational landscaping, . . . accounting and [a] business law course." (Id.) Petitioner has "marketable skills." (Id.)

4. Petitioner has no pre- or post-commitment history of violent crime.[2]

5. Petitioner's "maturation, growth and greater understand[ing] and advanced age . . . has reduced the probability of recidivism." (Id.)

6. Petitioner "has realistic parole plans which include two job offers, family support and at least three places to reside." (Id.) Petitioner has "maintained family ties while in prison by letters, visits and phone calls." (Id.)

7. Petitioner made "significant improvement in self-control." During his incarceration, petitioner received only two 115's; one on May 1, 1985, for using a blanket as a rug or carpet, and another on April 4, 1984, for disobeying orders. (Id. at 57.) In addition, the Board found that petitioner "show[s] signs of remorse, indicates he understands the nature and magnitude of the offense and accepts responsibility for [inaudible] behavior, [and] has a desire to change towards good citizenship." (Id.)

8. Finally, the Board found that the psychological evaluations support petitioner's release on parole. (Id. at 57-59.)

On June 22, 2005, Governor Schwarzenegger issued the decision challenged in the instant action, reversing the Board's grant of parole. The Governor's decision was as follows:

> [Petitioner] went to the apartment of a drug dealer, Frank Cologgi, three times on November 16, 1981. On the third visit, [petitioner] shot Mr. Cologgi to death. Mr. Cologgi's body was discovered

---

[2] Petitioner had one prior arrest in 1976 for grand theft/auto for which he received 24 months informal probation and 60 days in jail. (Id. at 56.)

3

later that evening by his roommate.

When officers arrived at the scene, they concluded that Mr. Cologgi had died from two gunshot wounds to the head. They found a pillow bearing two holes, surrounded by burn marks in the living room near the body.

When [petitioner] was arrested, police found 240 grams of marijuana and 1.6 grams of cocaine in his apartment. He denied killing Mr. Cologgi but admitted to going to Mr. Cologgi's apartment to buy cocaine and to pick up marijuana that was being "fronted" to him for sales.

Although [petitioner] pled not guilty, a jury found him guilty of second-degree murder with the use of a deadly weapon, possession of marijuana for sale, and possession of narcotics. He was sentenced to a total of 19 years to life in prison, which included 15-to-life for the murder plus two consecutive two-year terms, one for the weapon enhancement and the other for possession of marijuana for sale. The judgment was affirmed on appeal.

[Petitioner's] only documented trouble with the law at the time of the murder was a conviction at age 20 for grand theft, which resulted in his undesirable discharge from the Army. Since entering state prison more than 21 years ago for Mr. Cologgi's murder, he has been disciplined twice for prison-rules violations and counseled nine times for misconduct. He has, however, remained discipline-free for the last 10-plus years and has made creditable efforts during his incarceration to enhance his ability to function within the law upon release. He has earned an Associate of Arts degree and also a Bachelor of Arts degree in Social Science, and he has taken classes in marketing and business. He has upgraded vocationally by taking a class in landscaping and gardening and by working in a wide array of skilled institutional jobs. He has availed himself of self-help and therapy, including Breaking Barriers, Alternatives to Violence, and Anger Management. He also has volunteered as a Red Cross AIDS/HIV instructor and in CAL/OSHA Hazardous Communication training. Likewise, he has maintained close family ties and has realistic, confirmed plans for housing and employment upon parole. All these factors are supportive of [petitioner's] release from prison to parole.

[Petitioner] says that he was addicted to alcohol and drugs when he committed the murder and told the 2005 Board that he also was dealing drugs at the time. He has participated in Narcotics Anonymous, albeit intermittently, during 1992 and 1993, in Alcoholics Anonymous consistently from 1992 through 1995, and other substance-abuse-prevention programming since 2004. I note that, via an interstate transfer, [petitioner] spent more than five years in the Oregon State Prison, and while there he was unable to

participate in any like substance-abuse treatment. Although he, to his credit, resumed such programming after his return in 2002 to California, recent mental-health evaluators agree that alcohol and drugs remain risk factors for him. And his 2004 evaluator concluded that mandatory substance-abuse treatment would be a critical feature of any release program. Given his alcohol and drug history – and the nexus between drugs and the murder [petitioner] committed – it is critical that [petitioner] participate regularly in Narcotics Anonymous, Alcoholics Anonymous, and any other substance-abuse-prevention programming while in prison, to the extent such is available to him, and that he make and follow through with plans to do so upon parole.

Despite initially denying that he shot Mr. Cologgi and maintaining his innocence throughout his trial and appeal and for years thereafter, [petitioner] now admits that he murdered Mr. Cologgi because he thought the cocaine he bought from him was of poor quality. He told the 2004 mental-health evaluator that he thought Mr. Cologgi had "altered" $25 worth of the cocaine. He also told the 2005 Board, "There's no way I can justify what I did . . . [F]or all I know he might have given me exactly what [cocaine] he got . . . I don't know if I can ever atone for what I've done."

Notwithstanding the expression of remorse, [petitioner] committed an especially vicious second-degree murder and did so for an exceedingly trivial reason. According to the appellate record, the prosecution's theory of the case was that the "murder was more akin to a robbery gone bad", but "the violent aspect of this offense was the major focus of the case." Regardless of the version of events that one accepts, the bottom line is that [petitioner] shot the victim twice in the head, killing him, because he was mad about buying some bad drugs. Being angry at someone for selling $25 worth of lower-quality or less-pure cocaine is, needless to say, materially less significant than that which conventionally drives one to commit such an act of violence, let alone to commit murder. It is also noted that at the time of the probation report, while still denying the crime, he himself said that whoever committed the murder used a pillow to muffle the sounds of the shots and that obviously indicates premeditation. The circumstances of the murder – inclusive of [petitioner] returning to Mr. Cologgi's apartment, armed with a gun, to confront him and then shooting him twice in the head while attempting to muffle the sound with a pillow – make the second-degree murder of which [petitioner] was convicted especially grave. And this factor alone is enough for me to conclude that his release from prison would pose an unreasonable public-safety risk.

[Petitioner] has been in prison a long time now and has made considerable gains over the years. But given the current record before me and after carefully considering the very same factors the Board must consider, I find the especially grave nature of the

       second-degree murder committed by [petitioner] presently outweighs the positive factors tending to support his parole suitability.  Accordingly, because I believe his release from prison would pose an unreasonable risk of danger to society at this time, I REVERSE the Board of Prison Terms' 2005 decision to grant parole to [petitioner].

(Pet., Ex. D.)

       Petitioner challenged the Governor's decision in state court through petitions for writ of habeas corpus filed at every level of the state court system.  The last reasoned rejection of his challenge was the decision of the San Bernardino County Superior Court, which addressed petitioner's claim as follows:

> . . . the Governor found that the circumstances of the crime were such that he must conclude that petitioner poses an unreasonable risk of danger to society.
>
>   This court does not second guess the Governor of the State of California when he makes a decision which is within his discretion based upon undisputed evidence.
>
>   A person convicted of a crime has no inherent or constitutional right to conditional release from the expiration of a valid sentence. Petitioner has no right to a conditional sentence during his lifetime. A prisoner has no right to parole <u>at all</u>.  The determination whether a prisoner should be released on parole is an executive decision.
>
>   California Penal Code section 3041.2 provides that the Governor makes his decision regarding parole based upon the same record considered by the Parole Board.  Obviously, this was done in this case.
>
>   Where there is some evidence in support of an adverse determination, as there is in this case, the decision falls within the broad discretion vested in the executive, and courts should not preempt the Governor's constitutional role in the exercise of judgment and discretion.
>
>   Whether or not this Court would have granted parole under the circumstances is irrelevant.  The fact that the petitioner is disappointed with the Governor's decision is irrelevant.  The fact that the Governor proceeded in an appropriate legal manner is the question here.
>
>   Perhaps, at another time, the Governor will change his mind. Perhaps another Governor will be elected who is more sympathetic

> to the contentions of a man who would kill another man over twenty-five dollars worth of narcotics. At any rate, there is no basis for this petition and it is denied.

(Answer, Ex. 4, at 22-23.)

III. <u>Anti-Terrorism and Effective Death Penalty Act</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See <u>Lindh v.Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). <u>See</u> <u>also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1229 (9th Cir. 2001).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result. <u>Early v. Packer</u>, 537 U.S. 3, 7 (2002) (citation omitted).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ

7

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."); accord Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle, 313 F.3d at 1167.

IV. Analysis

    A.  Some Evidence

In his first claim, petitioner alleges that there is no evidence that petitioner poses a risk to public safety to support the Governor's reversal of the Board's 2005 decision finding him suitable for parole. Respondent argues that petitioner has no federal liberty interest, but that in any event, petitioner received all the process he was due, and the state court properly found the Governor's decision was supported by some evidence in the record.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without

due process of law." U.S. Const. amend. XIV, § 2.  A person alleging a due process violation must demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. Kentucky Dep't. of Corrs. v. Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  Board of Pardons v. Allen, 482 U.S. 369, 373 (1987). In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).  However, when a state's statutory parole scheme uses mandatory language, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

Under California law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement."  In re Dannenberg, 34 Cal.4th 1061, 1078, 23 Cal.Rptr.3d 417 (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board will set a parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public."  In re Lawrence, 44 Cal.4th 1181, 1202, 82 Cal.Rptr.3d 169 (2008) (citing Cal.Penal Code § 3041(a)).  A release date will not be set, however, if the Board determines "that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration. . . ." California Penal Code § 3041(b).

California state prisoners who have been sentenced to prison with the possibility of parole have a clearly established, constitutionally protected liberty interest in receipt of a

parole release date. Allen, 482 U.S. at 377-78 (quoting Greenholtz, 442 U.S. at 12); McQuillion, 306 F.3d at 903.

In the context of parole proceedings, it is well established that inmates are not guaranteed the "full panoply of rights" afforded to criminal defendants under the Due Process Clause. See Pedro v. Or. Parole Bd., 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded limited procedural protections. The Supreme Court has held that a parole board's procedures are constitutionally adequate so long as the inmate is given an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. Hayward v. Marshall, 603 F.3d 546, 560 (9th Cir. 2010) (quoting Greenholtz, 442 U.S. at 16). As a matter of state constitutional law, denial of parole to California inmates must be supported by "some evidence" demonstrating future dangerousness. Hayward, 603 F.3d at 562 (citing In re Rosenkantz, 29 Cal.4th 616, 128 Cal.Rptr.2d 104 (2002)); see also Lawrence, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); In re Shaputis, 44 Cal.4th 1241, 1254, 82 Cal.Rptr.3d 213 (2008) (same). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010), and compliance with this evidentiary standard is, therefore, mandated by the federal Due Process Clause. Pearson v. Muntz, 606 F.3d 606, 611 (9th Cir. 2010). Thus, a federal court undertaking review of a "California judicial decision approving the . . . decision rejecting parole" must determine whether the state court's decision "was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).

When assessing whether a state parole board's suitability decision was supported by some evidence,

> the analysis is shaped by the state regulatory, statutory, and constitutional law that governs parole suitability determinations in California. See Hayward, 603 F.3d at 561-62. California law

requires the Board to grant an eligible inmate a parole date unless the Board determines that "consideration of the public safety requires a more lengthy period of incarceration for this individual." Cal.Penal Code § 3041(b).

Pirtle v. California Board of Prison Terms, 611 F.3d 1015, 1020 (9th Cir. 2010).

Title 15, Section 2402 of the California Code of Regulations sets forth various factors to be considered by the Board in its parole suitability findings for murderers. The regulation is designed to guide the Board's assessment regarding whether the inmate poses an "unreasonable risk of danger to society if released from prison," and thus whether he or she is suitable for parole. Lawrence, 44 Cal.4th at 1202. The Board is directed to consider all relevant, reliable information available, including the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Title 15 Cal.Code Regs. § 2402(b).

However,

> [u]nder California law, "the paramount consideration for both the Board and the Governor" must be "whether the inmate currently poses a threat to public safety and thus may not be released on parole," [In re Lawrence, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535] at 552 [(2008)], and "the facts relied upon by the Board or the Governor [must] support the ultimate decision that the inmate remains a threat to public safety." Id. at 554. Accordingly, for a reviewing court "the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety." Id. at 553; see also Hayward, 603 F.3d at 562 (noting that " 'some evidence' of future dangerousness is indeed a state sine qua non for denial of parole in California") (citing Lawrence, 82 Cal.Rptr.3d 169, 190 P.3d at 549; In re Shaputis, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573, 582 (2008)).

Cooke, 606 F.3d at 1214.  "[T]he ultimate question of parole suitability [is] whether the inmate poses a threat to public safety."  See Pirtle, 611 F.3d at 1021.  "There must be some evidence of such a threat . . . and not merely evidence that supports one or more of the Board's subsidiary findings.  In particular, the Board may not rely solely on the circumstances of a commitment offense, because the prisoner's aggravated offense does not establish current dangerousness 'unless the record also establishes that something in the prisoner's pre-or post-incarceration history, or his or her current demeanor and mental state' supports the inference of dangerousness."  Id. (internal citations and quotations omitted).[3]

Depending upon the circumstances, factors such as the prisoner's age and the passage of time may make continued reliance on unchanging factors like the nature of the commitment offense unreasonable.  See Lawrence, at 1218-19, 1221; In re Roderick, 154 Cal.App.4th 242, 277, 65 Cal.Rptr.3d 16 (2007); In re Lee, 143 Cal.App.4th 1400, 1412, 49 Cal.Rptr.3d 931 (2006).  "[I]n some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes."

---

[3] Under current state law as recently clarified by the California Supreme Court,

> the determination whether an inmate poses a current danger is not dependent upon whether his or her commitment offense is more or less egregious than other, similar crimes. [Citations omitted.]  Nor is it dependent solely upon whether the circumstances of the offense exhibit viciousness above the minimum elements required for conviction of that offense.  Rather, the relevant inquiry is whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense.  This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.  [Citations omitted].

In re Lawrence, 44 Cal. 4th at 1221.

Lawrence, 44 Cal.4th at 1221 (internal citation omitted).

In the instant case, both parties agree that the Governor relied solely on petitioner's commitment offense to reverse the Board's parole suitability finding. (Answer at 2; Traverse at 2.) The court concurs with their reading of the Governor's decision. However, the Governor touched on two tangential points he did not rely on in reversing the grant of parole, but which the court finds were not supported by the record.

The Governor claimed petitioner was unable to participate in substance abuse programs while incarcerated in Oregon. However, the record reflects the opposite. It appears petitioner was incarcerated in Oregon from 1995 to 2000 pursuant to an Interstate Compact. (Dkt. No. 36-3 at 2, 4.) In 2000, the psychologist stated that "[r]ecords continue to reflect a positive lifestyle with on-going active participation in a variety of self-improvement programs." (Dkt. No. 36-3 at 2.) The 1998 psychological evaluation also confirms the participation. (Dkt. No. 36-3 at 6.) "Since he has been in Oregon, he has exhibited much of the same behavior: He has not received any disciplinary reports and has been involved in many activities and programs some of which include Pathfinders, alcohol and drug treatment, both individual and group counseling, vocational training, and certification as an AIDS/HIV counselor." (Id.)

The Governor also appeared to suggest that petitioner's remorse or insight into his crime were relatively recent. However, the record reflects petitioner has expressed remorse since at least 1988. (Dkt. No. 36-3 at 21("extreme remorse about both the victim and the victim's family, as well as his own family"); (Dkt. No. 36-3 at 19 ("significant remorse"); (Dkt. No. 36-3 at 12 ("extremely remorseful"); (Dkt. No. 36-3 at 8); (Dkt. No. 36-3 at 20); and (Dkt. No. 36-3 at 6 ("genuine remorse"). Therefore, since 1988, it appears that petitioner has consistently expressed remorse.

With regard to insight, in petitioner's first psychiatric evaluation in 1988, petitioner explained his initial denial of guilt was based on his inability to recall the events surrounding the murder, primarily due to petitioner's level of intoxication. (Dkt. No. 36-3 at 21.)

Petitioner thought he had a couple of six-packs of beer, one gram of cocaine, and a couple of marijuana joints. (Id.) Petitioner did not recall pulling the trigger. (Id.) By 1995, petitioner "was able to describe the causative factors for his substance abuse problem," which Ronald H. Kitt, Ph.D., concluded "was directly related to the criminal behavior." (Dkt. No. 36-3 at 12.) Dr. Kitt found that petitioner had "psychiatrically improved greatly due to his sobriety and sincere efforts towards his rehabilitation." (Dkt. No. 36-3 at 13.) The 1996 psychological evaluation by Jerome S. Gordon, Ph.D., reflects that petitioner was describing the crime as in prior reports, stating he does not remember the actual murder, although he recalled picking up the gun about a year and a half prior to the 1996 interview. (Dkt. No. 36-3 at 8.) Dr. Gordon noted that petitioner "understands the role that substance abuse has played in his criminal history." (Id.) Importantly, the 1998 psychological report states:

> Previous reports indicate that [petitioner] was lacking insight into his behavior particularly regarding his crime and any need for behavioral adjustments. However, in the past few years he has participated in both individual and group therapy as well as a variety of other programs designed to enhance interpersonal awareness; his involvement in such programs appears to have had a positive effect in that [petitioner] demonstrates better insight and self-critical thinking. He expressed genuine remorse for his crime. He understands the importance of staying clean and sober and is committed to his recovery.

(Dkt. No. 36-3 at 6.) Therefore, the record reflects that by 1998, petitioner had insight into his crime.

The court turns now to the Governor's decision. Petitioner's commitment offense occurred more than twenty-four years prior to the Governor's decision to reverse the Board's finding that petitioner is suitable for parole. The Governor cited nothing from petitioner's pre- or post-conviction history to support his conclusion that petitioner's release from prison "would pose an unreasonable public safety risk." The exhaustive findings made by the Board in their decision, many of which were cited by the Governor, explain this omission: there was inadequate evidence in the record to support a determination that petitioner posed a current

danger to the community. The Governor's decision to find petitioner unsuitable for parole was not supported by "some evidence" of current dangerousness. Consequently, the decision violated petitioner's right to due process.

Petitioner is only entitled to relief if the last reasoned state court decision rejecting his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The state superior court's decision was both contrary to applicable principles of federal law and an unreasonable determination of the facts in the record. Indeed, the state court simply deferred to the Governor's discretion. (Dkt. No. 33-1 at 23.) Accordingly, petitioner is entitled to relief. This court will recommend that the California Board of Parole Hearings be ordered to set a parole date that will ensure that petitioner is released on parole within thirty days from the date of any order by the district court adopting these findings and recommendations. See Pirtle v. California Board of Prison Terms, at 611 F.3d at 1025.

   B. Remaining Claims

In light of the above recommendation, the court need not reach the other claims raised by petitioner.

V. Conclusion

The undersigned recommends that petitioner's application for a writ of habeas corpus be granted. If either party files objections, that party shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3).

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted; and

2. The California Board of Parole Hearings be directed to set a parole date for

petitioner that will ensure his release on parole within thirty days from the date of any order by the district court adopting these findings and recommendations.

   These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:   September 30, 2010

              _____
              KENDALL J. NEWMAN
              UNITED STATES MAGISTRATE JUDGE

hell2518.157